IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Ricky Dyckes, Jr., | ) | Case No. 3:21-cv-03972-JDA |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| South Carolina Department of | ) | |
| Juvenile Justice, Velvet McGowan, | ) | |
| Freddie Pough *in his individual* | ) | |
| *capacity*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

_____

This matter is before the Court on Defendants' motion to dismiss or, in the alternative, for summary judgment.[1] [Doc. 44.] For the reasons that follow, the motion is granted in part.

On December 8, 2021, Plaintiff filed this action, in which he alleges a claim against Defendants Freddie Pough ("Pough") and Velvet McGowan ("McGowan") pursuant to 42 U.S.C. § 1983 for retaliatory termination in violation of his First Amendment rights (the "Retaliation Claim") as well as state-law claims against Defendant South Carolina Department of Juvenile Justice ("DJJ") for wrongful termination in violation of public policy and assault. [Doc. 1.] On November 13, 2023, Defendants filed a motion to dismiss or, in the alternative, for summary judgment. [Doc. 44.] Plaintiff then filed a response in

_____

[1] Defendants style their motion as a "motion to dismiss." [Doc. 44.] However, they invoke both Rule 12(b)(6) and Rule 56 of the Federal Rules of Civil Procedure. [Doc. 44-1 at 1–3, 10, 12, 14, 16, 25, 30]; *see* Fed. R. Civ. P. 12(b)(6); 56.

opposition to the motion on January 11, 2024 [Doc. 50], and Defendants filed a reply on January 22, 2024 [Doc. 55].  Accordingly, the motion is ripe for review.

## BACKGROUND

In ruling on a motion for summary judgment,[2] this Court reviews the facts and reasonable inferences in the light most favorable to the nonmoving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007); *see also Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 433 (4th Cir. 2013).  Viewed in the light most favorable to Plaintiff, the summary judgment record reveals the following facts.[3]

Plaintiff began working for DJJ on August 2, 2010, and was terminated on August 27, 2021.  [Docs. 44-3 at 1; 50-1 at 7 (21:1).]  Plaintiff worked as a correctional officer at the Broad River Road Complex ("BRRC"), which is a long-term facility that houses juveniles within DJJ.  [Docs. 44-7 ¶ 1; 50-1 at 8 (27:11–28:22).]  In 2019 and at the time of his termination, Plaintiff was a lieutenant/assistant unit manager.  [Docs. 44-7 ¶ 1; 50-1 at 8 (28:22).]  At all times relevant to this case, Pough served as DJJ's executive director and McGowan served as DJJ's executive director of security.  [Docs. 1 ¶¶ 3, 4, 8; 5 ¶¶ 3, 4, 8.]

Prior to his termination, Plaintiff repeatedly voiced objections openly and publicly regarding various issues at DJJ.  For example, on February 19, 2019, Plaintiff sent reports

---

[2] As stated, Defendants filed their motion under both Rule 12(b)(6) and Rule 56 of the Federal Rules of Civil Procedure.  Because matters outside the pleadings have been presented to and not excluded by the Court, the Court treats the motion as one for summary judgment under Rule 56.  *See* Fed. R. Civ. P. 12(d).

[3] The Court cites portions of the Amended Complaint at times to note Plaintiff's allegations, which the Court does not assume to be true in considering Defendants' entitlement to summary judgment.

to Pough and McGowan, along with other members of DJJ's upper management, asserting that Plaintiff's unit was severely understaffed and that the lack of staff was compromising safety, among many other concerns.  [Docs. 50-1 at 9 (30:10–32:9); 50-4; 50-5.]

On March 13, 2019, Plaintiff submitted a report alleging that, for reasons that he believed were retaliatory, he was forced to cover a particular area instead of attending a meeting with the other managers.  [Doc. 44-11.]  Plaintiff was then notified the next day by BRRC's interim facility administrator, Melody Lawson, that his work location would be changing from BRRC to another DJJ facility, Midlands Evaluation Center ("MEC").  [Docs. 44-9; 50-1 at 13 (47:15–19).]  Lawson told Plaintiff the change was for the betterment of the agency.  [Doc. 50-1 at 13 (47:22–25).]  McGowan, however, told Plaintiff that the change actually was *not* for the betterment of the agency because Plaintiff was needed where he already was.  [*Id*. at 14 (49:1–7).]  Plaintiff then sent another report on March 24, 2019, to Pough and McGowan, asserting that the change in work location was "direct retaliation and targeting from the agency" for his February complaints.  [Doc. 50-6.]  Ultimately, the work-location-change decision was reversed before any actual change occurred.  [Doc. 50-1 at 14 (49:8–11), 17 (63:6–10).]

On June 14, 2019, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the South Carolina Human Affairs Commission ("SCHAC") concerning DJJ's alleged refusal to grant an accommodation for a medical condition.  [Doc. 44-2 at 1–3.]  In this complaint, which was not directly related to his prior criticisms of DOJ, Plaintiff alleged sex discrimination under Title VII and disability discrimination under the Americans with Disabilities Act, as well as retaliation.

[*Id.*]  The SCHAC and the EEOC issued dismissals and notices of right to sue finding no cause to believe that there had been any statutory violation.  [*Id.* at 4–5.]

Plaintiff's time at DOJ also included multiple disciplines that were later rescinded as well as actions by him that were problematic for his superiors.  On October 15, 2019, Plaintiff received a written reprimand for taking unauthorized leave on September 22, 2019, and was docked 12 hours of pay. [Docs. 50-1 at 18–19 (65:12–72:10); 50-7.] Plaintiff successfully challenged that discipline, and the reprimand was removed and his pay reinstated.  [Doc. 50-1 at 18 (68:23–25), 19 (70:3–72:10).]

Plaintiff further alleges that on April 17, 2020, he was suspended after allegedly leaving juveniles unattended during an April 2020 riot.  [*Id.* ¶¶ 23–26.]  Plaintiff alleges that he challenged this suspension and was reinstated and paid for the time that he missed due to the suspension.  [*Id.* ¶ 27.]  Plaintiff also claims that on July 26, 2020, he complained about staffing issues yet again, but nothing changed to alleviate his concerns. [*Id.* ¶¶ 28–29.]  He alleges that, after further complaints, he received a written reprimand on September 10, 2020, for using profanity, but that he challenged the reprimand and it was rescinded on the basis that it was unwarranted.  [*Id.* ¶¶ 30, 32.]

In the summer of 2020, Plaintiff became interested in a new unit manager captain position that had been posted online.  [Docs. 50-1 at 21 (79:16–21); 50-8 at 1.]  When Plaintiff questioned Facilities Administrator Sean Kane as to why he had not been interviewed for the position, Kane indicated that McGowan had asked him to select the top two candidates to be interviewed and Plaintiff was not among those.  [Docs. 44-3 at 1 (providing Kane's position); 50-1 at 21 (79:24–80:18); 50-8 at 1.]  Plaintiff approached McGowan, and she denied Kane's assertion and assured Plaintiff that he would be

4

interviewed. [Docs. 50-1 at 21–22 (80:19–81:13); 50-8 at 1–2.] Plaintiff indeed was interviewed for the position on August 19, 2020, but was not selected for the position. [Docs. 50-1 at 22 (81:20–21; 84:16–22); 50-8 at 2.] Afterwards, in September 2020, Plaintiff requested that he receive a copy of the interviewers' evaluations of him (the "Interview Scores") because he believed he had been the most qualified candidate, that there may have been some irregularities in the interview process, and that he was the subject of ongoing discrimination and retaliation. [Doc. 50-1 at 23–24 (88:20–91:5); 50-8 at 2.]

In early 2021, Plaintiff became an acting unit manager captain and took on additional responsibilities. [Docs. 1 ¶ 34; 5 ¶ 34; 50-1 at 23 (87:16–25).] Plaintiff alleges that in the summer of 2021, while in his new position, he continued to report the unsafe working conditions, understaffing, mismanagement, and concerns for safety. [Doc. 1 ¶ 35.] Additionally, on June 4, 2021, Plaintiff participated in an employee walk-out, meant to "publicly expose and protest the chronic problems at DJJ, the deplorable living conditions for juveniles in DJJ custody and the intolerable working conditions for staff." [Doc. 50-1 at 27–30 (101:5–114:10).] After the walk-out, news outlets publicized statements Plaintiff made regarding his concerns about DJJ. [Docs. 1 ¶ 37; 5 ¶ 37.].

On June 7, 2021, Plaintiff stepped down as acting captain via an email to Kane, McGowan, and several others and asserted that he had been bullied, targeted, and harassed into stepping down. [Docs. 44-12; 50-1 at 23 (87:1–15), 25 (94:9–18).] Plaintiff further alleges that, on June 9, 2021, he testified in front of the legislative committee examining Pough's fitness for his position and that the committee subsequently gave Pough a "no confidence" vote. [Doc. 1 ¶ 38; *see also* Doc. 50-2 at 12 (48:3–8).] Plaintiff

alleges he also spoke with South Carolina's State Law Enforcement Division regarding his concerns with Pough, McGowan, and others in DJJ's upper management.  [Doc. 1 ¶ 39.]

The events forming the basis for Plaintiff's termination occurred on June 27, July 27, and July 28, 2021.  On June 27, 2021, at 5:24 p.m., Plaintiff intentionally left his assigned post without receiving authorization to do so, leaving the 12 youth in his charge unattended.  [Docs. 44-3 at 1; 44-13.]  Before walking out, Plaintiff stated to Kane and Lawson—in Pough's presence—that he was leaving; that he was "tired of being a b[***]h for the juveniles [and] staff"; that he was "tired of juveniles getting away with any and everything"; that "he was done with the job"; and that he would "deal with this when [he came] back."  [Doc. 44-13; *see* Docs. 44-3 at 1; 44-7 ¶ 2.]

On July 27, 2021, Plaintiff called Kane to discuss obtaining the Interview Scores.  [Doc. 44-7 ¶ 3.]  During the conversation, he called Kane and McGowan "liars," and he told Kane that "when he came to work the following day there was going to be a 'motherf[***]ing problem.'"  [*Id.*; Doc. 44-3 at 2.]  McGowan received a phone call the same day from Plaintiff, who told her that he had called Kane and wanted to know why he could not get the Interview Scores.  [Docs. 44-7 ¶ 4; 50-1 at 30 (115:2–116:3).]  As McGowan began to talk, Plaintiff yelled over her and told her, "[Y]ou and Kane . . . some mother f[***]ing liars."  [Doc. 50-1 (116:4–12); *see* Docs. 44-3 at 1–2; 44-7 ¶ 4.]  The comments were overheard by 12 other participants in a meeting in which McGowan was participating at the time.  [Docs. 44-3 at 2; 44-7 ¶ 4.]

On July 28, 2021, Plaintiff left his post where he was supervising youth, and he walked up to Kane in front of both youth and staff and asked him "in an aggressive

6

demeanor" why he was holding the Interview Scores back from him, and Kane responded that he was not doing so.  [Doc. 44-3 at 2; *see* Docs. 44-7 ¶ 5; 44-15; 50-1 at 31 (119:11–120:24).]  Plaintiff cut Kane off and asserted that Kane was lying and "was a part of all of the lies that people ha[d] been telling and that is why [Plaintiff] was not able to grow in the agency."  [Doc. 44-15.]  Plaintiff continued to question Kane in an increasingly loud voice, to the point that he was yelling.  [*Id.*; Docs. 44-3 at 2; 44-7 ¶ 5.]  Hearing the outburst, one of Plaintiff's co-workers, Captain Grooms-Bellamy, entered and attempted to redirect Plaintiff out of the door, telling Plaintiff that this was not the right place for this discussion.  [Docs. 44-3 at 2; 44-7 ¶ 5; 44-15; 50-1 at 31–32 (120:25–121:3).]  Plaintiff then "ripped his arm from [Captain Grooms-Bellamy] and . . . charged towards [Kane] while using gross profanity towards [Kane]."  [Doc. 44-15; *see* Docs. 44-3 at 2; 44-7 ¶ 5.]  Plaintiff stated that Kane "was a coward and a b[***]h and . . . was doing some b[***]h s[**]t."  [Doc. 44-15; *see* Docs. 44-3 at 2; 44-7 ¶ 5.]  He also called McGowan and Kane "lying motherf[***]ers" and told Kane to "call [McGowan's] fat a[*]s down" there because he was tired of being lied to.  [Doc. 44-3 at 2; *see* Doc. 44-7 ¶ 6.]  Kane then told Plaintiff that the discussion had to end because he was acting unprofessionally and it was not the appropriate time or place to talk about it.  [Doc. 44-15.]

Lawson called Administrator of Centralized Institutional Operations Crayman Harvey and informed him that she had instructed Plaintiff to leave the premises due to his having threatened Kane.  [Docs. 44-7 ¶¶ 6–7; 44-16.]  Harvey arrived on the scene with DJJ Criminal Investigator Administrator James Flowers and instructed Plaintiff to leave the BRRC facility immediately.  [Docs. 44-7 ¶ 7; 44-16.]   Rather than leave as instructed, Plaintiff began to pace around and stated, "'[W]e better get the real police[.]  I'm not going

nowhere.'"  [Doc. 44-16; *see* Doc. 44-7 ¶ 7.]  Plaintiff was placed in handcuffs behind his back, secured out of the unit, and frisk searched, and his cell phone, badge, and unit keys were confiscated.  [Docs. 44-7 ¶ 7; 44-16.]

On July 29, 2021, Plaintiff was issued a notice of suspension pending investigation and notice of intent to terminate based on the incidents of June 27, July 27, and July 28, 2021.  [Docs. 44-7 ¶ 9; 50-1 at 32 (122:11–13).]  On August 11, McGowan held a pre-disciplinary conference with Plaintiff, and Plaintiff's employment was terminated on August 27, 2021, by letter from McGowan.  [Docs. 44-3; 44-7 ¶¶ 10–11.]  The letter confirmed that Plaintiff's termination was based on his actions of June 27, July 27, and July 28, 2021, and it set out in detail Plaintiff's actions and the numerous DJJ polices that his conduct violated.  [Doc. 44-3.]  The letter emphasized that his conduct on each of the days separately justified his termination.  [*Id.*]

Plaintiff filed a grievance concerning the termination, but he lost at DJJ's first level of review.  [Docs. 44-4; 44-5; 44-7 ¶¶ 12, 18; 50-1 at 32 (122:14–123:1).]  He then appealed to the State Human Resource Director, and DJJ's decision was upheld.  [Docs. 44-6; 44-7; 50-1 at 32 (122:14–123:1).]

## APPLICABLE LAW

### Requirements for a Cause of Action Under § 1983

Plaintiff filed this action pursuant to 42 U.S.C. § 1983, which provides a private cause of action for constitutional violations by persons acting under color of state law. Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).  Accordingly, a civil

8

action under § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief."  *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).  Section 1983 provides, in relevant part,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or any person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  To establish a claim under § 1983, a plaintiff must prove two elements: (1) that the defendant "deprived [the plaintiff] of a right secured by the Constitution and laws of the United States" and (2) that the defendant "deprived [the plaintiff] of this constitutional right under color of [State] statute, ordinance, regulation, custom, or usage." *Mentavlos v. Anderson*, 249 F.3d 301, 310 (4th Cir. 2001) (third alteration in original) (citation and internal quotation marks omitted).

The under-color-of-state-law element, which is equivalent to the "state action" requirement under the Fourteenth Amendment,

> reflects judicial recognition of the fact that most rights secured by the Constitution are protected only against infringement by governments.  This fundamental limitation on the scope of constitutional guarantees preserves an area of individual freedom by limiting the reach of federal law and avoids imposing on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed.

*Id.* (quoting *Dowe v. Total Action Against Poverty in Roanoke Valley,* 145 F.3d 653, 658 (4th Cir. 1998)) (internal citations and quotation marks omitted).  Nevertheless, "the deed of an ostensibly private organization or individual" may at times be treated "as if a State has caused it to be performed." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,

531 U.S. 288, 295 (2001).  Specifically, "state action may be found if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior 'may be fairly treated as that of the State itself.'"  *Id.* (internal quotation marks omitted).  State action requires both an alleged constitutional deprivation "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State . . . or by a person for whom the State is responsible" and that "the party charged with the deprivation [is] a person who may fairly be said to be a state actor." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).  A determination of whether a private party's allegedly unconstitutional conduct is fairly attributable to the State requires the court to "begin[ ] by identifying the specific conduct of which the plaintiff complains." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 51 (1999) (internal quotation marks omitted).

**Summary Judgment Standard**

Rule 56 of the Federal Rules of Civil Procedure states, as to a party who has moved for summary judgment:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).  A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant.  *Id.* at 257.  When determining whether a genuine issue has been raised, the court must construe all

inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. *Id.* Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* Further, Rule 56 provides in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

11

Fed. R. Civ. P. 56(c)(1).  Accordingly, when Rule 56(c) has shifted the burden of proof to the non-movant, he must produce existence of a factual dispute on every element essential to his action that he bears the burden of adducing at a trial on the merits.

## DISCUSSION

**The Retaliation Claim**

Defendants argue that Plaintiff's Retaliation Claim, which is asserted against McGowan and Pough, should be dismissed because he does not adequately allege that he is suing them in their individual capacities and, to the extent he is suing them in their official capacities, they are entitled to dismissal of the claim.  [Doc. 44-1 at 12–16.] Defendants alternatively argue that, regardless of whether Plaintiff named Pough and McGowan in their individual capacities, official capacities, or both, they are entitled to summary judgment on Plaintiff's claim because Plaintiff has failed to create a genuine dispute of material fact concerning whether Plaintiff was terminated or otherwise disciplined for his speech.  [*Id.* at 16–24.]  The Court addresses these arguments seriatim.

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws abridging the freedom of speech."  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (internal quotation marks omitted).  "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right."  *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000).  "While government employees do not lose their constitutional rights at work, the Supreme Court has repeatedly held that the government may impose certain restraints on its employees' speech and take action against them that would be unconstitutional if applied to the

12

general public." *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011).

"A plaintiff seeking to assert a § 1983 claim on the ground that he experienced government retaliation for his First Amendment-protected speech must establish three elements: (1) his speech was protected, (2) the alleged retaliatory action adversely affected his protected speech, and (3) a causal relationship [existed] between the protected speech and the retaliation." *Raub v. Campbell*, 785 F.3d 876, 885 (4th Cir. 2015) (internal quotation marks omitted).  For an employer to adversely affect its employee's protected speech, "courts have required that the nature of the retaliatory acts committed by a public employer be more than *de minimis* or trivial." *Suarez Corp. Indus.*, 202 F.3d at 686.  For purposes of a First Amendment retaliation claim under § 1983, a plaintiff experiences an adverse action "if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005) (internal quotation marks omitted).

### The capacities in which Pough and McGowan are sued

Defendants argue that because the caption in the Complaint specifically states that Pough is being sued "in his individual capacity" and there is no such language regarding McGowan, the Court should construe the Complaint as naming McGowan in her official capacity only.  [Doc. 44-1 at 13.]  Defendants also argue that because the caption is the only place in the Complaint that explicitly specifies that Pough is being sued in his individual capacity and because the Complaint alleges that Pough was acting as DJJ's executive director, the Court should construe the Complaint also as naming Pough in his

official capacity only.  [*Id.*]  Further, Defendants argue that the Retaliation Claim should be dismissed as to both Pough and McGowan to the extent that they are sued only in their official capacities because they are not "persons" under 42 U.S.C. § 1983 and the Eleventh Amendment bars the claim.  [*Id.* at 13–16.]

In his response to Defendants' motion, Plaintiff clarifies that he is not suing these Defendants in their official capacities but is suing them in their individual capacities only. [Doc. 50 at 12–14].  This is how the Court construes the Complaint as well.  Plaintiff's allegation that Pough was acting as DJJ's executive director at all relevant times in this case is not in any way inconsistent with the Complaint's statement that he is being sued in his individual capacity for actions he took as executive director.  As for McGowan, "a plaintiff need not plead expressly the capacity in which he is suing a defendant in order to state a cause of action under § 1983."  *Biggs v. Meadows*, 66 F.3d 56, 60 (4th Cir. 1995).  "[W]hen a plaintiff does not allege capacity specifically, the court must examine the nature of the plaintiff's claims, the relief sought, and the course of proceedings to determine whether a state official is being sued in a personal capacity."  *Id.* at 61.  Here, the Complaint does not allege that Pough or McGowan acted in accordance with any DJJ policy or custom, Plaintiff seeks compensatory and punitive damages [Doc. 1 ¶¶ 49, 50], and Defendants asserted qualified immunity as a defense in their Answer [Doc. 5 ¶ 81]. Applying the *Biggs* factors to this case, the Court concludes that it can be "ascertained fairly" that Plaintiff's intention is to sue Pough and McGowan in their individual capacities. *Gregory v. Currituck Cnty.*, No. 21-3163, 2022 WL 1598961, at *2 (4th Cir. May 20, 2022) (internal quotation marks omitted).

### *Pough and McGowan are entitled to summary judgment*

Defendants alternatively argue that, to the extent Plaintiff sues Pough and McGowan in their individual capacities, Defendants are entitled to summary judgment on the Retaliation Claim because Plaintiff has not forecasted evidence that could support a reasonable inference that Plaintiff was disciplined for his speech. [Doc. 50 at 16–24.]  On this point, the Court agrees.

<u>The Retaliation Claim is based only on Plaintiff's termination</u>

The first point to be addressed is what allegedly retaliatory disciplinary actions form the basis for Plaintiff's claim.  Importantly, a plaintiff may not amend his complaint through argument in a brief opposing summary judgment.  *Barclay White Skanska, Inc. v. Battelle Mem'l Inst.*, 262 F. App'x 556, 563 (4th Cir. 2008).  "[C]onstructive amendment of the complaint at summary judgment undermines the complaint's purpose and can thus unfairly prejudice the defendant."  *Harris v. Reston Hosp. Ctr., LLC*, 523 F. App'x 938, 946 (4th Cir. 2013).  Therefore, the Court analyzes which disciplinary actions Plaintiff's Complaint alleges form the basis of his Retaliation Claim.

The Complaint's fact section references several occasions where DJJ officials announced Plaintiff would be disciplined or made other decisions affecting him.  [Doc. 1 ¶¶ 20, 22, 24–27, 30, 32.]  The section of the Complaint setting out the Retaliation Claim, however, alleges as follows, in relevant part:

> 45.    That Plaintiff repeats and realleges the preceding paragraphs as if restated verbatim.
>
> 46.    That in all their actions, and specifically in their actions in issuing disciplinary actions to Plaintiff and terminating him on August 27, 2021, Defendants McGowan and Pough acted 'under color of State law.'

15

47.    That Defendants McGowan and Pough *terminated Plaintiff on August 27, 2021, because Plaintiff spoke on numerous occasions on a matter of public concern*, to wit:  the chronic mismanagement at DJJ, the intolerable working conditions for staff such as Plaintiff, the deplorable conditions in which juveniles in DJJ custody were housed, and the violations of [the Prison Rape Elimination Act ("PREA")] that Plaintiff observed, among other public reports relating to DJJ and its upper management.

48.    That, *in terminating Plaintiff because he had spoken on a matter of public concern*, Defendants McGowan and Pough deprived Plaintiff of his rights protected by the First Amendment of the United States Constitution.

49.    That, *as a direct and proximate result of being terminated*, Plaintiff suffered actual damages in the form of lost wages and employment benefits, and he endured a negative effect on his career and earning capacity.

[Doc. 1 ¶¶ 45–49 (emphasis added).]

Accordingly, Defendants maintain that "[t]he operative allegations from [the Retaliation Claim] exclusively address the termination of his employment rather than the issuance of any disciplinary actions upon him by any" Defendant.  [Doc. 44-1 at 16 n.8 (citing Doc. 1 ¶¶ 47–49).]  Defendants contend that Plaintiff's Complaint does not allege that he was actually disciplined for his speech other than by being terminated.  [*Id.* at 16–19.]  In his response, Plaintiff appears to argue that the Retaliation Claim, in addition to being based on his termination, is also based on some of the other disciplines referenced in the fact section of the Complaint.  [Doc. 50 at 15.]

The Court agrees that Plaintiff's Retaliation Claim, as pled, is based on his termination only.  As Defendants argue, the termination is the only action taken against him that the Complaint alleges violated Plaintiff's First Amendment rights.  [Doc. 1 ¶ 48.]  Indeed, his termination is the only action that the Complaint alleges caused Plaintiff any

16

injury.[4]  [*Id.* ¶ 49.]    Therefore, the Court will focus its analysis on Plaintiff's termination argument.

<u>Plaintiff has not forecasted sufficient evidence that his speech was a substantial factor in the termination decision</u>

Defendants argue that they are entitled to summary judgment regarding the Retaliation Claim because Plaintiff has not forecasted evidence that could support a reasonable inference that Plaintiff's termination was causally connected to his speech on a matter of public concern.  [Doc. 44-1 at 19–25.]  The Court agrees.

In a claim for First Amendment retaliatory discharge, a plaintiff must show that his speech "was a substantial factor in the employee's termination decision."  *McVey v. Stacy*, 157 F.3d 271, 277–78 (4th Cir. 1998).  The causation requirement is a rigorous one.  *See Huang v. Bd. of Governors of Univ. of N.C.*, 902 F.2d 1134, 1140 (4th Cir. 1990).  "[T]he initial burden lies with the plaintiff, who must show that his protected expression was a 'substantial' or 'motivating' factor in the employer's decision to terminate him."  *Wagner v. Wheeler*, 13 F.3d 86, 90 (4th Cir. 1993).  If the plaintiff is successful, the burden shifts to the defendant to "show, by a preponderance of the evidence, that the decision to terminate the plaintiff would have been made even in the absence of the protected expression, more simply, the protected speech was not the but for cause of the termination."  *Id.*

Assuming without deciding that Plaintiff can meet his initial burden, Plaintiff has not forecasted evidence sufficient to create a genuine dispute of material fact as to

---

[4] Although Plaintiff alleges in the facts section of his Complaint that he was moved to MEC after repeatedly complaining about understaffing at DJJ, the Complaint does not allege that the transfer was retaliatory, that MEC was a less desirable assignment, or that the change affected him negatively in any way.  [Doc. 1 ¶ 20.]

whether his protected speech was the but for cause of his termination.  Plaintiff does little

to dispute the facts set out in the termination letter that form the bases for his termination,

and Plaintiff's attempts to downplay his actions do little to advance his case.  His conduct

was unmistakably abusive, aggressive, belligerent, insubordinate, and reckless on

multiple occasions.  Plaintiff does not dispute that he left his post without permission on

June 27, 2021, but he states that it was "because he had been working a lengthy time in

unsanitary conditions with urine and feces coming up through the drains in the units where

juveniles were housed, with an unacceptable staff-to-juvenile ratio[], and in conditions that

violated PREA."  [Doc. 50 at 6.]  He also cites evidence that "leaving the job site was

regularly required and regularly done by all employees to ensure that [DJJ] was operating

efficiently," which, due to understaffing, meant sometimes leaving the juveniles

unattended.  [*Id.* at 16.]  He emphasizes that when he announced he was leaving, no one

explicitly told him he was not free to leave, and that he would have had to attend a meeting

in about an hour on the day he abandoned his post even had he not ended his day early.

[*Id.* at 6–7.]  He also mentions that he had never been specifically warned about leaving

his post prior to participating in the June 2021 walk-out.  [*Id.* at 7, 17.]  As for his telephone

call with McGowan on June 27, 2021, Plaintiff argues that it was a stressful time due to

the understaffing problems and the effects of the COVID crisis.  [*Id.* at 16.]  And regarding

the allegation that he threatened Kane, Plaintiff points to his testimony denying that he

threatened anyone.  [*Id.* at 17.]

Plaintiff's arguments are insufficient to create a genuine dispute of material fact

concerning causation.  The Court does not doubt that Plaintiff's job was a difficult one, but

that hardly excuses abandoning his post and leaving unattended the juveniles he was in

charge of supervising, let alone the belligerent and insubordinate conduct he exhibited as he left. And that Kane did not specifically inform him of the obvious, that he was not authorized to simply walk off the job without permission, is of no moment. Regarding Plaintiff's contention that understaffing at DJJ caused employees sometimes to have to leave the juveniles temporarily unsupervised as they performed other needed work, that fact does nothing to undercut the inappropriateness of leaving the juveniles unattended for non-work-related reasons. Indeed, Plaintiff does not deny that his decision to suddenly abandon his post placed both the youth and his co-workers in potential danger. [*Id.* at 16.]

Regarding his July 27, 2021, phone conversation with McGowan, Plaintiff does not deny yelling and cursing, calling her and Kane names, and telling McGowan, "[W]hen I come to work tomorrow there's going to be a problem." [Doc. 50-1 at 34 (131:24–132:15).] Nor does he deny that the next day he loudly cursed at Kane while he stood only three or four feet away. That Plaintiff did not believe his words and actions could properly be characterized as a "threat" is a mere linguistic quibble that does nothing to call into question the genuineness of Defendants' view of Plaintiff's conduct. As McGowan stated in the termination letter, any one of the three incidents discussed would have justified terminating Plaintiff. [Doc. 44-3.] And the Court notes that Plaintiff has not identified any other DJJ employee who ever engaged in similar conduct without suffering comparable consequences.

Accordingly, given Plaintiff's unprofessional and belligerent actions, a reasonable jury could only conclude any protected speech by Plaintiff was not the but for cause of his termination. *See Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007)

(affirming the grant of summary judgment to the employer on the basis that the plaintiff failed to forecast sufficient evidence that his termination was due to his protected conduct rather than his threatening behavior); *cf. Stewart v. GES Recycling S.C., LLC*, No. 7:21-cv-01782-JDA, 2024 WL 2013855, at *7 (D.S.C. May 7, 2024) (granting summary judgment to the employer on a Title VII retaliation claim; assuming a prima facie case of retaliation was established but holding that the plaintiff failed to forecast evidence that he was not terminated for confronting his supervisor in a belligerent and insubordinate manner); *Boyd v. Nephron Pharms. Corp.*, No. 3:20-4385-MGL-PJG, 2022 WL 2500341, at *3, 6 (D.S.C. May 19, 2022) (granting summary judgment to the employer on a retaliation claim brought under the Americans with Disabilities Act; assuming a prima facie case of retaliation was established but holding that the plaintiff failed to forecast evidence that she was not terminated for confronting a manager in a profane, threatening, and intimidating manner), *Report and Recommendation adopted in relevant part by* 2022 WL 2302199 (D.S.C. June 27, 2022).[5]  The Court therefore grants Defendants' motion for summary judgment as to the Retaliation Claim, which is Plaintiff's only federal cause of action.

**Supplemental Jurisdiction**

Plaintiff's remaining state-law claims could be heard by this Court through the exercise of supplemental jurisdiction, which allows federal courts to hear and decide state-law claims along with federal claims.[6]  Federal courts are permitted to decline to

---

[5] Although the standards involved in the Title VII and ADA claims cited are not identical to the standard in the First Amendment claim before the Court, the holdings in these cases are "nevertheless instructive."  *Hughes v. Bedsole*, 48 F.3d 1376, 1387 (4th Cir. 1995).

[6] A civil action for Plaintiff's state-law claims could be cognizable in this Court under the diversity statute if that statute's requirements are satisfied.  However, this Court does not

exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3), however, if "the district court has dismissed all claims over which it has original jurisdiction." A court has "wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995). In deciding whether to exercise supplemental jurisdiction, courts look at "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." *Id*. "[G]enerally, when a district court dismisses all federal claims in the early stages of litigation—e.g., at the summary-judgment stage—it should decline to exercise jurisdiction over any remaining pendent state law claims by dismissing those claims without prejudice." *Henderson v. Harmon*, No. 22-6029, 2024 WL 2195579, at *6 (4th Cir. May 16, 2024) (internal quotation marks omitted) (affirming district court's granting of summary judgment to defendants on the only remaining federal claim and declining to exercise supplemental jurisdiction and dismissing the state-law claim without prejudice).

In this case, dismissal of the state-law claims is appropriate in light of the *Shanaghan* factors. The remaining claims present state-law questions. Additionally, the case is at the early stages of litigation and judicial economy will not be hindered by remanding the state-law claims.[7] Accordingly, the Court declines to exercise

---

have diversity jurisdiction in this case because Plaintiff and Defendants apparently are all citizens of the State of South Carolina [Doc. 1 ¶¶ 1–4], which defeats the required complete diversity of parties, *see* 28 U.S.C. § 1332.

[7] The case was also recently reassigned to the undersigned on February 14, 2024, and thus judicial economy would be no better served if this Court retains jurisdiction instead of remanding the remaining state-law claims.

supplemental jurisdiction over Plaintiff's state-law claims in this case and dismisses them without prejudice.

## **CONCLUSION**

Wherefore, based upon the foregoing, Defendants' motion for summary judgment [Doc. 44] is GRANTED IN PART.  The motion is granted as to Plaintiff's First Amendment retaliation claim brought under § 1983.  As to Plaintiff's state-law claims, the Court declines to exercise supplemental jurisdiction over those claims, and they are DISMISSED without prejudice.

IT IS SO ORDERED.

s/Jacquelyn D. Austin
United States District Judge

June 14, 2024
Greenville, South Carolina